IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA HENSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 12 C 3845 |
| v. | ) |
| | ) |
| T-MOBILE USA, | ) Suzanne B. Conlon, Judge |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Lisa Henson sues her former employer, T-Mobile USA ("T-Mobile"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. She claims she was sexually harassed by her supervisor, discriminated against her based on her race and sex, and that T-Mobile retaliated against her after she complained internally and to the Equal Employment Opportunity Commission ("EEOC"). T-Mobile moves for summary judgment. For the reasons below, the motion is granted.

### BACKGROUND

Northern District of Illinois Local Rule 56.1 provides the procedure for summary judgment. It requires that statements of material facts contain allegations supported by record evidence. L.R. 56.1(a), (b)(3)(C); *Malec v. Sanford*, 191 F.R.D. 581, 583-84 (N.D. Ill. 2000) (Castillo, J.). A response to a statement of material facts must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The court has broad discretion to require strict compliance with the local rules. *Matthews v. Donahoe*, No. 12-1065, 2012 WL 4378272, at *2 (7th Cir. Sept. 26, 2012).

Many of Henson's responses fail to match T-Mobile's facts or contain denials

unsupported by record citations. *See, e.g.*, Pl. Resp. to Def. Facts ¶ 29 (stating Henson had 15 customer meetings during the third quarter of 2011 in response to assertion she reported three customer meetings between July 11 and August 8); ¶ 49 (unsupported denial). General denials are insufficient to rebut a movant's factual allegations. *Malec*, 191 F.R.D. at 584. Facts raised in response to a statement of material facts may properly be disregarded unless separately included in the non-movant's statement of additional facts. *See Prewitt v. United States*, Nos. 10 C 102 & 11 C 3136, 2012 WL 5381281, at *1 (N.D. Ill. Oct. 31, 2012) (Kocoras, J.).

Several of Henson's additional "facts" consist primarily of arguments or conclusions. *See, e.g.*, Pl. Addt'l Facts ¶ 1 (stating events indicate "a pattern of T-Mobile's retaliatory behavior that ultimately led to [Henson's] retaliatory discharge"). Conclusions couched as factual assertions may be disregarded. *De v. City of Chicago*, --- F. Supp. 2d ---, 2012 WL 6605009, at *3 (N.D. Ill. Dec. 14, 2012) (Castillo, J.). Other assertions contain or are supported by inadmissible hearsay. For example, Henson names three T-Mobile employees whom she claims were placed on performance improvement plans. Pl. Addt'l Facts ¶ 16. Her knowledge is based on statements by these employees or others at T-Mobile. *Id.* (citing Ex. A, Henson Dep. 365:5-13). A statement by an unsworn, out of court declarant introduced for the truth of the matter asserted is hearsay. Fed. R. Evid. 801(c). Hearsay is inadmissible for summary judgment. *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 942 (7th Cir. 2012).

The court is obligated to carefully review statements of facts, eliminating any arguments, conclusions, and assertions unsupported by admissible record evidence. *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 507 (N.D. Ill. 2011) (Dow, J.). The court considers the parties' submissions only to the extent they comply with Local Rule 56.1's

requirements. The following facts are taken from the parties' statements of fact and exhibits.

Henson, an African-American woman, worked as a Senior Business Development Manager in Chicago, Illinois, for T-Mobile's Business Enterprise Sales Unit beginning on August 2, 2010. Def. Facts ¶¶ 4, 5. T-Mobile terminated her employment 14 months later, on October 10, 2011. Pl. Addt'l Facts ¶ 13.

Senior Business Development Manager ("Development Manager") is a sales position. Development Managers call on businesses with 2,000 or more employees to sell T-Mobile's products and services and develop business clients for T-Mobile. Def. Facts ¶ 8. They typically do not handle the accounts of current or former T-Mobile customers. Id. Job performance is evaluated based on a quota comprised of Subscriber Identity Module ("SIM") activations and "contract points," or credit for contracts signed. Id. ¶¶ 10, 12. Development Managers are expected to conduct face-to-face customer meetings, which are critical to obtaining new business. Id. ¶ 13. Newly hired Development Managers are allowed a "ramp-up period" to gain experience and build skills without being strictly held to performance goals. Id. ¶ 14. They are expected to begin signing contracts, obtaining SIMs, and holding face-to-face meetings with prospective customers during the ramp-up period. Id. When the ramp-up period ends, they normally must satisfy 75% of their quota to avoid corrective action. Id. ¶ 15.

Henson was in a ramp-up period from August 2, 2010 through the end of the first quarter of 2011. Id. ¶¶ 16-17. She was not in a ramp-up period beginning the second quarter of 2011, although she and Jim Pilcher, another recently hired Development Manager, were supposed to receive an extension of the ramp-up period. Id. ¶ 19; Pl. Resp. to Def. Facts ¶ 19, Ex. A, Henson Dep. 134:2-137:12, 433:2-434:22. She did not meet her quotas. Def. Facts ¶¶ 16-20, 24, 32.

Philip Maxwell, her immediate supervisor, evaluated her job performance on July 11, 2011 and placed her on a performance improvement plan. *Id.* ¶ 26; Pl. Addt'l Facts ¶ 3. He met with Henson again two months later, on August 8, 2011, to discuss her job performance and issue her a formal reminder of expectations. Def. Facts ¶ 30; Pl. Addt'l Facts ¶ 5. Shortly before the end of the third quarter, all the employees in Henson's department submitted fourth quarter business plans. Def. Facts ¶ 33; Pl. Addt'l Facts ¶ 8. Henson's business plan reflected she had achieved 10% of her quota for the second quarter and 0% of her quota for the third quarter. Def. Facts ¶¶ 33-34. Neither Maxwell nor his supervisor, Tom Fisher, believed Henson's top three potential accounts would generate business during the fourth quarter. *Id.* ¶¶ 37, 40-41.[1] On September 20, 2011, Maxwell issued Henson a "Decision Time" memorandum indicating she must comply immediately with performance expectations or face disciplinary action, up to and including termination. *Id.* ¶ 42. Three weeks later, Henson had obtained no new contracts or SIM activations, and Maxwell and Fisher decided to terminate Henson's employment. *Id.* ¶ 43. Henson was notified she was fired three days later. *Id.* ¶¶ 43-44; Pl. Addt'l Facts ¶ 13.

Henson contends she was subjected to sexual harassment and discrimination based on her sex and race during her employment with T-Mobile. The first incident of alleged discrimination occurred in January or February of 2011, when Fisher, then Henson's immediate supervisor, asked whether she wanted to be at T-Mobile and stated she looked "disgruntled" and "angry." Def. Facts ¶ 55. In March 2011 Fisher called her into his office to ask why she had not responded to a work-related e-mail he sent over the weekend and told her she needed to respond more promptly to information requests. *Id.*

---

[1] Henson disagrees with the assessment but cites no evidence to contradict that Fisher and Maxwell held this belief. This fact is deemed undisputed. Fed. R. Civ. P. 56(e)(2).

Henson claims Maxwell discriminated against her and harassed. In March or April of 2011, after he began working at T-Mobile, Maxwell shook Henson's hand for several seconds while staring into her eyes. *Id.* ¶ 57. In April 2011, he met Henson off-site at a Starbuck's in a Dominick's grocery store during business hours. *Id.* ¶ 58. At this meeting, he called Henson "disgruntled" and someone who "hides out in conference rooms" and inquired whether she wanted to be at T-Mobile. *Id.* He told her she "fucked up" by sending an e-mail complaining about her quota to others at T-Mobile and advised her to direct her work concerns to him. *Id.* Later that month, he again asked her whether she wanted to be at T-Mobile and told her she should consider transferring to another position. *Id.* ¶ 59. He called her his "litigious friend," which she believed was a reference to a lawsuit she had filed against a former employer, and stated he and Fisher "did not give a damn about a lawsuit." *Id.*

Maxwell never asked Henson to perform sexual favors for him. *Id.* ¶ 60. However, she was uncomfortable by Maxwell's relationship with Tina Blake, a Senior Account Manager on her team who frequently went out to lunch with Maxwell and spent hours with him in his office with the door closed. *Id.* Rumors circulated that Maxwell and Blake were having an affair. Henson witnessed Blake caress Maxwell's back and engage in sexual banter at a work-related event. *Id.* She further contends Maxwell harassed her in August 2011 by gesturing to depict the size of his penis while discussing the pain associated with passing a kidney stone. *Id.* ¶ 62. She also claims she was told she would have to give up one of her accounts to a co-worker who was a white male and denied access to other accounts on T-Mobile's client database. *Id.* ¶¶ 63-64.

In April or May 2011, Henson complained to Mamie Richards in human resources about her meeting with Fisher in March, her meeting with Maxwell at Starbuck's in April, and her

5

follow-up discussion with Maxwell. *Id.* ¶ 70. On July 13, 2011, Henson used the Integrity Line, T-Mobile's internal reporting tool, to express concern that Maxwell and Blake were having an affair, to complain about being placed on a performance improvement plan two days earlier, and to report that Maxwell and Fisher were harassing her. *Id.* ¶ 71; Pl. Addt'l Facts ¶ 4. Dan Weber, a director in human resources, investigated and found all her claims to be unsubstantiated. Def. Facts ¶ 72. Nonetheless, T-Mobile transferred Blake to a different team to avoid the perception of favoritism. *Id.* When Fisher informed Henson that Blake had been transferred, he stated "how dare you" accuse Maxwell of having an affair with Blake, whom Maxwell had known for 17 years and who was the godmother of his children. *Id.* ¶ 61. Maxwell and Weber met with Henson in late July to explain she was expected to work from her cubicle unless she was at a business meeting or had approval to work from the conference rooms or from home. *Id.* ¶ 73.

On August 9, 2011, Henson filed a charge of discrimination with the EEOC alleging sex and race discrimination and harassment. Pl. Addt'l Facts ¶ 6. She amended her charge of discrimination on October 14, 2011, after she was terminated. Def. Facts ¶ 76. The EEOC issued Henson a right to sue letter on April 10, 2012. *Id.* ¶ 77. She sued on May 17, 2012.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate if the record evidence reveals no genuine issue of material fact and T-Mobile is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Collins v. Am. Red Cross*, --- F.3d ---, 2013 WL 856512, at *1 (7th Cir. Mar. 8, 2013). T-Mobile bears the initial burden of showing it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Because Henson has the burden of proof at trial, T-Mobile's burden is

satisfied by demonstrating an absence of evidence supporting her case. *Id.* at 325. The burden shifts to Henson to present specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24. A genuine issue of material fact exists if the evidence is sufficient to support a reasonable jury verdict in Henson's favor. *Collins*, 2013 WL 856512, at *1. All facts and reasonable inferences are viewed in the light most favorable to Henson, but the court will not draw inferences supported only by speculation or conjecture. *Id.*

II.     **Sex and Race Discrimination**

Henson claims T-Mobile discriminated against her based on race and sex in violation of Title VII and based on race in violation of § 1981. 42 U.S.C. §§ 1981(a), 2000e-2(a). The elements of Title VII and § 1981 discrimination claims are the same and may be proved directly or indirectly. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 & n.1 (7th Cir. 2012). Henson concedes there is no direct evidence that race or sex motivated T-Mobile's actions. To prevail using the indirect method, she must demonstrate a *prima facie* case of discrimination by showing (1) she is a member of a protected class, (2) she met T-Mobile's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably than Henson. *Collins*, 2013 WL 856512, at *4. The burden then shifts to T-Mobile to present legitimate, non-discriminatory reasons for its employment actions. *Id.* If T-Mobile meets this burden, Henson must prove T-Mobile's proffered reasons are pretext. *Id.* Neither party disputes Henson is a member of a protected class. They dispute the second and fourth elements, and the extent of the third.

A.      **Adverse Employment Action**

Adverse employment actions take three general forms: (1) termination or reduction in

benefits or financial terms of employment; (2) transfers or changes in job duties that diminish an employee's skills, thereby reducing future job prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or constructive discharge. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011). An adverse employment action must be "materially adverse" and "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (internal quotation omitted).

Both parties agree Henson's termination constitutes an adverse employment action. Henson claims she also suffered an adverse employment action when she was prohibited from using conference rooms without Maxwell's approval and denied access to accounts on salesforce.com, T-Mobile's client database, after she filed her charge with the EEOC.

Changes in room assignments that do not preclude an employee from performing her job do not constitute an adverse employment action. *Ellman v. Woodstock #200 Sch. Dist.*, No. 99 C 50017, 2001 WL 218958, at *8-9 (N.D. Ill. Feb. 26, 2001) (Reinhard, J.). Henson does not assert the conference room restrictions prevented her from doing her job. She was not precluded from using the conference room altogether; she was simply notified she needed to schedule her conference room use in advance and could not use the rooms for four to eight hours at a time. Def. Facts ¶ 73. She maintained use of her cubicle, which was located in the same general floor space as other Development Managers. *Id.* ¶ 69. Under these facts, the conference room restriction was not an adverse employment action.

Whether Henson's lockout from the client database constitutes an adverse employment action is a closer question. She asserts that in September 2011 she was denied access to "many lucrative sales accounts she had previously been working on." Pl. Resp. to Def. Facts ¶ 64. The

inability to access account information could negatively impact a sales employee's job performance by making it more difficult to contact potential clients or make sales. *Id.* ¶ 64, Ex. A, Henson Dep. 317:23-24 ("when you are denied accounts, it basically means you can't work on them any more"). However, the evidence here is insufficient to support a reasonable jury finding that Henson could not access the accounts that were formally assigned to her.

Henson contends she was denied access to "[her] own account" on salesforce.com, but the only account she identifies—Advocate or Children's Memorial—was former Development Manager Mike Thompson's account. Henson Dep. 318:4-9. She concedes that when Thompson was transferred to a new position in August, "[t]he list was changing on a daily basis" because his accounts "were to be divvied up." *Id.* at 316:8-11. She claims Maxwell "refused to help her," but she fails to dispute the assertion Maxwell continuously assigned her new accounts and told her she could still work on and receive credit for accounts assigned to her. Pl. Resp. to Def. Facts ¶ 64. These assertions are deemed undisputed. Fed. R. Civ. P. 56(e)(2).

Henson identifies no other accounts she could not access on salesforce.com. Henson Dep. 318:17-18. However, she identifies three additional accounts that were taken away from her. The first, the BrightStart account, is described without explanation as "the one that came up with this whole quid pro quo thing." *Id.* at 318:18-22. The second, the Harley Davidson account, is an account she was asked to work on with a Senior Account Manager whom she claims deliberately withheld information from her. *Id.* at 318:23-319:11. Her suggestion he was instructed by management not to help her, *id.* at 319:12-22, is speculation that cannot defeat summary judgment. *Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006). Finally, Henson claims she was told the Woodlawn Community Children's account would be transferred to a white

male, but the account remained hers until her termination. Def. Facts ¶ 63. Moreover, Henson has not argued T-Mobile's conduct regarding these three accounts was an adverse employment action, so the argument is waived. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (undeveloped arguments are waived).

Based on the undisputed facts presented, no reasonable jury could find that Henson's inability to access information for the one account reduced her financial terms of employment, diminished her marketable skills, or rendered her job conditions unbearable. *See Overly v. KeyBank N.A.*, 662 F.3d 856, 861 & n.2, 864-66 (7th Cir. 2011) (temporary loss of access to new client information could not support hostile work environment, discrimination, or retaliation claims where evidence suggested the loss resulted from reassignment process). Accordingly, only Henson's termination constitutes an actionable adverse employment action for purposes of her *prima facie* case of discrimination.

### B. Legitimate Workplace Expectations

Henson cannot establish a *prima facie* case of discrimination because the record evidence does not establish she met T-Mobile's expectations at the time of her termination. She failed to meet her quota for the two quarters preceding her termination. Def. Facts ¶¶ 20, 32. Her quota for the second quarter was 40 contract points and 175 SIMs, but she obtained zero contract points and 18 SIMs. *Id.* ¶ 20. She had two face-to-face meetings in the second quarter. *Id.* ¶ 21.

In the third quarter, Henson was expected to have two face-to-face customer meetings a week "and/or" a minimum of 62 SIM activations by the end of July, 124 SIM activations by the end of August, and 186 new SIM activations by the end of September. *Id.* ¶ 24. She obtained zero contracts and zero SIM activations and she failed to satisfy the face-to-face meeting

requirement. *Id.* Although she had as many as 15 face-to-face meetings during the third quarter, only 2 or 3 were with "new logos," or new business prospects. Pl. Resp. to Def. Facts ¶ 29, Ex. A, Henson Dep. 160:18-161:4. She argues Maxwell did not immediately inform her the face-to-face meetings needed to be with new business prospects. This argument is a red herring. Even assuming all non-"new logo" meetings counted, she would need a total of 26 meetings (13 weeks x 2 meetings/week). With only 15 meetings, she was 11 meetings short of her requirement.

Henson's performance did not improve after she was issued the "Decision Time" memorandum stating she must comply immediately with performance expectations or face disciplinary action, up to and including termination. Def. Facts ¶¶ 42-43. She obtained no new contracts or SIMs between the end of the third quarter and October 7, 2011, when T-Mobile decided to terminate her employment. *Id.* ¶ 43. Her low sales performance and failure to achieve progress towards her sales goals after repeated warnings from her supervisor are sufficient to show she did not satisfy T-Mobile's legitimate work expectations. *Jackson v. Xerox Corp.*, 349 F. Supp. 2d 1119, 1121-22 (N.D. Ill. 2004) (Bucklo, J.).

Henson concedes she "did not meet the exact quotas that were given to her," but argues "neither did her similarly situated colleagues." Opp'n at 6. She claims neither she nor Mike Thompson, the only other Development Manager who reported to Maxwell during the second and third quarters of 2011, made quota, but Thompson was not evaluated for performance because of his sales percentages or terminated. *Id.*; Def. Facts ¶ 46. When a plaintiff produces evidence sufficient to raise an inference an employer applied legitimate employment expectations in a disparate manner, the second and fourth prongs of the *prima facie* case merge. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).

11

Between April and August 2011, Thompson had 28 client face-to-face meetings as compared to Henson's five appointments; 65 contract points as compared to Henson's 0 contract points; 13% higher SIM activations than Henson; and a 98% contract-to-plan percentage compared to Henson's 0% of contract-to-plan percentage. Def. Facts ¶ 46. Based on these raw numbers alone, no reasonable factfinder could determine whether Thompson satisfied 75% of his quota, which would warrant corrective action. *Id.* ¶ 15. Moreover, Thompson was transferred to a new position in August and was not similarly situated to Henson when she was terminated in October. *Id.* ¶ 46. The evidence is insufficient to raise an inference T-Mobile applied its legitimate work expectations in a disparate manner. Henson's failure to identify a similarly situated co-worker who was treated more favorably obviates the need to address her allegations of disparate treatment in detail. *Peele*, 288 F.3d at 331.

The record clearly demonstrates Henson's job performance fell short of T-Mobile's legitimate work expectations. This is fatal to her *prima facie* case. The court need not further consider her discrimination claims.

### III. Retaliation

Title VII and § 1981 protect employees who oppose discrimination from retaliation. 42 U.S.C. § 2000e-3(a); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446, 451 (2008). The standards and methods of proof are the same. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Henson elects to proceed under the direct method of proof. To avoid summary judgment, she must present evidence of (1) her statutorily protected activity, (2) a materially adverse action by T-Mobile, and (3) a causal connection between the two. *Id.*

Complaining to an employer about impermissible discrimination and filing a charge of

discrimination with the EEOC are statutorily protected activities. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Henson's termination constitutes an adverse employment action for purposes of retaliation. *Smith*, 681 F.3d at 896. Her performance improvement plan, performance evaluations, and formal reminder of work expectations do not. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001). The plan requirements were not onerous, and the evaluations were designed to improve her work habits and productivity. *Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009).

T-Mobile has not admitted a retaliatory motive for Henson's termination. She therefore must present a "convincing mosaic" of circumstantial evidence to establish a causal connection. *Smith*, 681 F.3d at 900-01. Categories of circumstantial evidence include suspicious timing, ambiguous oral or written statements, or other bits and pieces from which an inference of retaliatory intent may be drawn; evidence similarly situated employees were treated differently; and evidence the employer's reason for the adverse employment action is pretextual. *Id.* at 901. Antagonistic behavior may reveal a retaliatory motive. *Roth v. Godiva Chocolatier, Inc.*, No. 06 C 3564, 2008 WL 95600, at *6 (N.D. Ill. Jan. 7, 2008) (Hibbler, J.). Henson argues the suspicious timing of her termination in relation to her complaints of harassment and discrimination, T-Mobile's personal animus toward her, and T-Mobile's more favorable treatment of other employees gives rise to an inference of a causal connection.

A rational jury would be hard-pressed to find a link between Henson's termination and her complaints of harassment and discrimination. Her complaints to T-Mobile in May and July and to the EEOC in August occurred months before her termination in October. *Kidwell v.*

*Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (gaps of five weeks and more than two months did not raise an inference of causation); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven week gap did not establish suspicious timing). Maxwell's reference in April to Henson as his "litigious friend" and his statement he and Fisher "did not give a damn about a lawsuit" did not reference her termination and are too far removed to support her retaliation claim. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("isolated comments" and "stray remarks" are insufficient to support discrimination claim). As previously explained, Henson provided no evidence she was treated differently than similarly situated employees. Her suggestion T-Mobile transferred Thompson to a new position in August to remove him as a comparator in anticipation of her lawsuit is pure speculation that does not defeat summary judgment. *Davis*, 452 F.3d at 697. Nor did T-Mobile treat Henson differently by requiring her to submit a fourth quarter business plan; all employees were asked to do the same.

Viewing the evidence and all reasonable inferences in her favor, there is insufficient evidence for a reasonable jury to find T-Mobile had a retaliatory motive for her termination.

**IV.    Sexual Harassment**

Title VII makes it unlawful for an employer to discriminate against an employee based on sex. 42 U.S.C. § 2000e-2(a). Henson claims the following conduct by Maxwell created a hostile work environment: (1) he held Henson's hand and stared into her eyes while shaking her hand; (2) he invited Henson to an off-site meeting at a Starbuck's coffee shop; (3) he engaged in a romantic relationship with Blake, Maxwell's subordinate and Henson's co-worker; and (4) he gestured to describe the size of his penis while discussing the pain associated with passing a kidney stone. Henson does not argue she was harassed because of her race, or that anyone at T-

Mobile besides Maxwell harassed her. She has waived these claims. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009) (failure to develop claim results in waiver).

To establish a *prima facie* case of harassment under Title VII, Henson must show (1) her work environment was objectively and subjectively offensive, (2) the harassment was based on her sex, (3) the conduct was either severe or pervasive, and (4) there is a basis for employer liability. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012). Henson fails to show Maxwell's conduct was based on sex, or was severe or pervasive.

Maxwell's relationship with Blake is not actionable. A supervisor's voluntary sexual relationship with a subordinate generally cannot form the basis of another employee's sexual harassment claim. *See Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002). Henson was not directly involved in Maxwell and Blake's relationship; she merely argues their relationship made her uncomfortable because she, the only other woman on Maxwell's team, did not perform sexual favors for Maxwell. The pressure Henson felt was self-imposed. Maxwell never asked Henson to perform sexual favors for him or made derogatory comments based on her sex. Def. Facts ¶¶ 60, 66.

Nor do the remaining incidents establish a hostile work environment. There is no evidence Maxwell's meeting with Henson at Starbuck's was motivated by her sex. The meeting took place in public during normal business hours, the discussion focused on Henson's employment with T-Mobile, and Maxwell had similar meetings with other members of his team. *Id.* ¶ 58. Maxwell's gesture depicting the size of his penis, while crude, appears to have been prompted not by Henson's sex, but by a discussion about pain and medical procedures—a conversation in which Henson willingly participated. *Id.* ¶ 62. No reasonable person would

likely find Henson's work environment hostile within the meaning of Title VII based on this incident. *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 902-03 (7th Cir. 2005) (co-worker's innuendo about his penis size, while inappropriate, was not actionable sexual harassment).

Finally, even if Maxwell's staring and lingering handshake were sexual, she presents no other evidence of physical contact with Maxwell. This type of isolated, physical contact with a non-intimate body part lacks the severity or pervasiveness required to support a hostile work environment claim. *See Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (staring insufficient to support a hostile work environment claim); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (several incidents of supervisor's touching of plaintiff's shoulder insufficient to establish actionable sexual harassment). Accordingly, T-Mobile is entitled to summary judgment on Henson's sexual harassment claim.

## CONCLUSION

T-Mobile is entitled to summary judgment on Henson's discrimination claims under Title VII and § 1981 because Henson failed to show she met T-Mobile's legitimate work expectations. Her retaliation claims under Title VII and § 1981 fail for lack of evidence T-Mobile had a retaliatory motive for firing her. Her sexual harassment claim under Title VII fails because the evidence does not show conduct based on sex or severe or pervasive conduct.

ENTER:

*/s/ Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

March 18, 2013